# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Kevin Scott Jordan,**
**Petitioner Below, Petitioner**

**FILED**

October 1, 2013
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

vs) **No. 12-1015** (Wood County 09-P-45)

**David Ballard, Warden,**
**Respondent Below, Respondent**

### MEMORANDUM DECISION

Petitioner Kevin Scott Jordan, by counsel Michael Farnsworth Jr., appeals the Circuit Court of Wood County's order entered on June 6, 2012, denying his amended petition for writ of habeas corpus. Respondent Warden David Ballard, by counsel Marland Turner, filed a response in support of the circuit court's decision, to which petitioner replied. On appeal, petitioner alleges that the circuit court erred in denying his amended petition for writ of habeas corpus because he was improperly convicted of forgery of a public document, the jury was improperly instructed, and he received ineffective assistance of counsel.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision is appropriate under Rule 21 of the Rules of Appellate Procedure.

In April of 2006, petitioner and his co-defendant robbed an elderly man with the threat of violence. Following an investigation, petitioner was arrested. At the time of petitioner's arrest he provided a fake name and signed three separate fingerprint cards with that false name. As a result, petitioner was indicted in September of 2006 on one count of first degree robbery in violation of West Virginia Code § 61-2-12; one count of conspiracy to commit first degree robbery in violation of West Virginia Code § 61-10-31; three counts of forgery of a public record, certificate, return or attestation of court or officer in violation of West Virginia Code § 61-4-1; and three counts of forgery in violation of West Virginia Code § 61-4-5. Following a two-day jury trial in December of 2006, petitioner was convicted on all counts. Petitioner was sentenced to a term of incarceration of fifty years for first degree robbery, plus an additional five years on a recidivist information filed against petitioner. Additionally, petitioner was sentenced to a term of incarceration of one to five years for conspiracy to commit first degree robbery and two to ten years for each of the three counts of forgery of a public record. Petitioner's sentences for forgery of a public record were to be served concurrently with each other, but consecutive to the first degree robbery and conspiracy charges. Petitioner filed his *pro se* petition for writ of habeas corpus in March of 2009. After the appointment of counsel, petitioner filed his amended petition for writ of habeas corpus on March 1, 2010. After conducting two omnibus evidentiary hearings in an effort to allow both parties to properly present arguments, the circuit court entered

1

its order denying petitioner's amended petition for habeas relief on June 6, 2012. This appeal followed.

Petitioner raises three assignments of error on appeal. First, petitioner argues that a plain reading of West Virginia Code §§ 61-4-1 and 61-4-5 show that the legislature intended to create two separate and distinct crimes: forgery of a public document, and forgery. Petitioner also argues that the circuit court erred because it incorrectly interpreted West Virginia Code § 61-4-1 to include the preparation or alteration of a fingerprint card. Petitioner argues that the indictment for forgery of a public record, certificate, return or attestation of court or officer was defective because it did not allege how a fingerprint card was a public record, certificate, return or attestation of court or officer.

Second, petitioner argues that the circuit court improperly interpreted West Virginia Code § 61-4-1 and improperly instructed the jury that signing a fingerprint card with a false name was sufficient to constitute the counterfeit production of a public record, certificate, return, or attestation of a public officer. Finally, petitioner argues that he received ineffective assistance of counsel because his trial counsel failed to adequately communicate and render legal advice regarding the plea offer made by the State.

This Court reviews appeals of circuit court orders denying habeas corpus relief under the following standard:

> "In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syllabus point 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

Syl. Pt. 1, *State ex rel. Franklin v. McBride*, 226 W.Va. 375, 701 S.E.2d 97 (2009).

After careful consideration of the parties' arguments, this Court concludes that the circuit court did not abuse its discretion in denying the amended petition for writ of habeas corpus. The circuit court's order reflects its thorough findings of fact and conclusions of law concerning petitioner's arguments raised on appeal. A review of the entire record supports that the circuit court did not improperly interpret West Virginia Code §§ 61-4-1 and 61-4-5. The circuit court's jury instruction followed the language of the relevant statutes. Finally, petitioner did not receive ineffective assistance of counsel. Petitioner represents that he discussed the plea offer with his attorney. Additionally, petitioner's trial attorney testified that she discussed the plea agreement with petitioner on two different occasions. The record on appeal does not support petitioner's assignments of error. Having reviewed the circuit court's "Amended Order Denying Petition For Habeas Corpus Relief" entered on June 6, 2012, we hereby adopt and incorporate the circuit court's well-reasoned findings and conclusions as to the assignments of error raised in this appeal. The Clerk is directed to attach a copy of the circuit court's order to this memorandum decision.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** October 1, 2013

**CONCURRED IN BY:**

Chief Justice Brent D. Benjamin
Justice Robin Jean Davis
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Allen H. Loughry II

IN THE CIRCUIT COURT OF WOOD COUNTY, WEST VIRGINIA

KEVIN SCOTT JORDAN

Petitioner

Vs.                                                       09-P-45

WARDEN, MOUNT OLIVE

CORRECTIONAL CENTER

Respondent

ENTERED
O.R. No.
Page

JUN - 6 2012

CAROLE JONES
CLERK CIRCUIT COURT

OPINION AND ORDER

Presently pending before the Court this 4th day of June, 2012, is the Petitioner's Amended Petition for a Writ of Habeas Corpus Ad Subjiciendum. This Amended Petition was filed as a result of a jury verdict finding the Petitioner guilty of Robbery in the First Degree, and other less serious offenses.

On the 23rd day of April, 2006, the Petitioner was charged, by warrant in the Magistrate Court of Wood County, with Robbery in the First Degree and three offenses of Forgery of a Public Document. A preliminary hearing was held on May 2, 2006, and the Petitioner was bound over to the Wood County Grand Jury.

The Petitioner was then indicted on September 15, 2006, by a Wood County Grand Jury on 8 charges: Count One: Robbery in the First Degree in violation of W.Va. Code 61-2-12; Count Two: Conspiracy to Commit Robbery in the First Degree in violation of W.Va. Code 61-10-31; Count Three: Forgery in violation of W.Va. Code 61-4-5; Count Four: Forgery of Public Record, Certificate, Return or Attestation of Court or Officer in violation of W.Va. Code 61-4-1; Court Five: Forgery in violation of W.Va.Code 61-4-5; Count Six: Forgery of Public Record,

1

Certificate, Return or Attestation of Court or Officer in violation of W.Va.Code 61-4-1; Count Seven: Forgery in violation of W.Va. Code 61-4-5; and, Count Eight: Forgery of a Public Record, Certificate, Return or Attestation of Court or Officer in violation of W.Va.Code 61-4-1.

The Petitioner was arraigned on the Indictment on September 22, 2006. Trial was held on December 5 and 6, 2006, and the jury returned a guilty verdict on each of the eight counts of the Indictment.

On April 20th, 2007, the Petitioner was sentenced to a term of fifty (50) years on Count One, that being the Robbery in the First Degree conviction, with five (5) years added due to a recidivist information filed against the Petitioner. This made the Petitioner's sentence on Count One a fifty-five (55) year sentence. Consecutive to this sentence was a period of confinement of not less than one (1) nor more than five (5) years on Count Two, that being the Conspiracy to Commit Robbery in the First Degree.

The State of West Virginia maintained, and the Court agreed, that Counts Three and Four were alternative pleading, Counts Five and Six were alternative pleading and Counts Seven and Eight were alternative pleading. Therefore, at sentencing, and upon Motion of the State, Counts Three, Five and Seven (each charging the offense of Forgery) were Dismissed and the Petitioner was not sentenced on those Counts. However, the Petitioner was sentenced to a term of not less than two (2) nor more than ten (10) years for each of the three convictions of Forgery of a Public Record, Certificate, Return or Attestation of Court or Officer, as charged in Counts Four, Six and Eight. These sentences were to be served concurrent with each other, but consecutive to the sentences imposed for Counts One and Two.

2

## FACTS UNDERLYING THE INDICTMENT:

It was alleged by the State that the Petitioner, and a co-defendant, James Eric Wine, robbed an elderly man, Maywood Burdette, of his wallet. This robbery was alleged to have occurred by the Petitioner and his co-defendant on a city street in Parkersburg just after dark, while the elderly gentleman was walking in his neighborhood. It was alleged that the co-defendant grabbed Mr. Burdette from behind in a choke-hold while the Petitioner threatened Mr. Burdette with violence if he did not produce his wallet. These are, briefly, the facts that led to Counts One and Two of the Indictment.

Upon the robbery being reported and investigated by the Parkersburg Police Department, the Petitioner was arrested. At the time of the Petitioner's arrest and processing, the Petitioner not only gave a false name to the Parkersburg Police Department, but he also signed three separate fingerprint cards with that false name. It was this conduct that led to the Petitioner being charged in Counts Three through Eight of the Indictment.

Additional facts will be developed below as they are needed to discuss and decide the various grounds raised in this habeas corpus proceeding.

## HABEAS CORPUS PROCEEDINGS:

After his conviction and sentencing, the Petitioner filed a *pro se* Petition Under West Virginia Code 53-4A-1 for Writ of Habeas Corpus. This *pro se* Petition was filed on March 24, 2009. This Petition alleged sixteen errors. Then, with the assistance of counsel, an Amended Petition for a Writ of Habeas Corpus Ad Subjiciendum was filed on March 1, 2010. Subsequent to the Amended Petition being filed certain evidentiary hearings were held and briefs were

3

submitted.

Specifically, in his *pro se* Petition filed March 24, 2009, the Petitioner alleged the following errors:

**Ground 1**: Ineffective Assistance of Counsel (Point 3 of Amended Petition)
-Attorney never visited him & kept him informed of case
-Did not explain plea
-Did not prepare defendant for his testimony
-Did not file post-trial motions concerning *Miranda* issue

**Ground 2**: Victim Identification Dispute (Point 4 of Amended Petition)

**Ground 3**: Improper Communication Between Prosecution Witnesses and Jury.

**Ground 4**: Failure to be Charged with a Lesser Included Offense (Point 5 of Amended Petition)

**Ground 5**: Claims of Prejudicial Statements by Jury Members (Point 6 of Amended Petition)

**Ground 6**: Double Jeopardy

**Ground 7**: Disclosure of Grand Jury Minutes. (Never disclosed)

**Ground 8**: Failure to Provide with a Copy of Indictment.

**Ground 9**: Violation of West Virginia Rules of Criminal Conduct.
-Prosecutor failed to disclose helpful evidence about witness's criminal record
-Prosecutor showed the victim only 2 photos (that of the defendant & co-defendant shortly before trial.

**Ground 10**: Disparity of Sentences (Point 7 of Amended Petition)

**Ground 11**: Sufficiency of the Evidence

**Ground 12**: Instruction to the Jury.
-The court erred in finding or interpreting the statute for the forgery of a public document. The State initially had alternate chargers for crime of forgery, then decided to convict on all six (This is moot since those charges were overturned/dismissed on 4/20)
-The court erred in instruction on flight.

**Ground 13**: Constitutional Errors in Evidentiary Rulings.
-Regarding *Miranda* issues
-Regarding admission of brass knuckles
-Regarding denial of motion for acquittal

**Ground 14**: Violating Defendant's Right Against Self Incrimination by

4

Prosecuting Forgery Charges Simultaneously to the Robbery. (Prejudicial Joinder?)

**Ground 15**: Information in Pre-Sentence Investigation Report Erroneous. -Argues should have been given *Miranda* warnings before interview

**Ground 16**: Violation of *Miranda* Rights under the Fifth Amendment of the U.S. Constitution

Then, in his <u>Amended Petition</u> filed by counsel on March 1, 2010, the following errors were alleged:

**Ground 1**: Counts four, six, and eight of the indictment fail to substantially follow the language of the statute, fail to state the elements of the offense charged and otherwise failed to put the defendant on fair notice of the charge against which he had to defend himself.

**Ground 2**: The jury instructions failed to sufficiently instruct the jury regarding the law concerning counts four, six, and eight of the indictment.

**Ground 3**: Defendant's trial counsel's performance was deficient under an objective standard of reasonableness because counsel failed to communicate with the defendant during the development of trial strategy and failed to communicate and render legal advice regarding the plea offer made by the state. (Ground 1 of *pro se* Petition)

**Ground 4**: The victim's in-court identification of the defendant was improperly tainted by the overtly suggestive out-of-court identification conducted by the office of the prosecuting attorney the day prior to the testimony of the victim. (Ground 2 and 3 of *pro se* Petition)

**Ground 5**: The defendant was entitled to an instruction on robbery in the second degree because by virtue of its legal elements or definition it is included in the offense of robbery in the first degree and there was evidence presented that tended to prove the lesser included offense. (Ground 4 of *pro se* Petition)

**Ground 6**: The defendant was denied his right to a panel of unbiased jurors when the trial court failed to disqualify jurors when it was demonstrated during voir dire that several potential jurors had a tenuous relationship to a prosecutorial arm of the state. (Ground 5 of *pro se* Petition)

**Ground 7**: The disparate sentence of the defendant whose involvement was

5

minor compared to the similarly situated codefendant is unconstitutional and should be reversed. (Ground 10 of *pro se* Petition)

It appears that certain grounds for relief were alleged in the *pro se* Petition but not alleged in the Amended Petition. It further appears that evidence and argument were not presented on all the allegations in the *pro se* Petition. The question then becomes: What happens to the grounds for relief that were alleged in the *pro se* Petition, but for which no evidence was presented in support of the ground and for which no argument has been made in support of the ground?

It is this Court's opinion that the various grounds for relief that have been mentioned, but either no facts have been presented in support of them, or no law or argument has been made in support of them, are waived. Those grounds for relief were, in essence, simply mentioned in the *pro se* Petition filed by the Petitioner. *State ex rel. Wensell v. Trent*, 218 W.Va. 529, 625 S.E.2d 291 (2005); *State ex rel. Hatcher v. McBride*, 221 W.Va. 760, 656 S.E.2d 789 (2007).

In *State v. Lilly*, 194 W.Va. 595, 461 S.E.2d 101 (1995) the issue before the Supreme Court of Appeals of West Virginia was the sufficiency of information provided to a magistrate for the issuance of a search warrant. An argument apparently made by the prosecution in support of the validity of the search warrant was the "good faith" exception to the warrant requirement. However, the Supreme Court refused to consider this argument for two reasons, the second of which is relevant here:

> Second, appellate courts frequently refuse to address issues that appellants, or in this case the appellee, fail to develop in their brief. In fact, the issue of "good faith" was adverted to in a perfunctory manner unaccompanied

6

by some effort at developed argumentation. Indeed, "[i]t is . . . well settled, . . . that casual mention of an issue in a brief is cursory treatment insufficient to preserve the issue on appeal." *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3rd Cir. 1993).

*Lilly* at footnote 16.

In *Clain-Stefanelli v. Thompson*, 199 W.Va. 590, 486 S.E.2d 330 (1997), there was an appeal concerning the use and width of a prescriptive right of way. The appellee made certain cross-assignments of error which were not considered by the Supreme Court of Appeals of West Virginia. Justice Maynard, in writing the opinion for the Court stated:

> While the appellee asserted these cross-assignments of error in her brief, she failed to elaborate, discuss, or cite any authority to support these assertions. In *State, Dept. Of Health v. Robert Morris N.*, 195 W.Va. 759, 765, 466 S.E.2d 827, 833 (1995), we stated that "[a] skeletal 'argument', really nothing more than an assertion, does not preserve a claim . . . .. Judges are not like pigs, hunting for truffles buried in briefs." (Citations omitted). We, therefore, decline to consider these cross-assignments of error.

*Clain-Stefanelli* at footnote 1.

Finally, in the criminal context with issues raised by a defendant, the Supreme Court of Appeals of West Virginia stated in *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996):

> In addition to the above assignments, the defendant raises some half-hearted assignments that were not fully developed and argued in the appellate brief. Although we liberally construe briefs in determining issues presented for review, issues which are not raised, and those mentioned only in passing but are not supported with pertinent authority, are not considered on appeal.

7

> *State v. Lilly*, 194 W.Va. 595, 605 n. 16, 461 S.E.2d 101,
> 111 n. 16 (1995) ("casual mention of an issue in a brief
> is cursory treatment insufficient to preserve the issue on
> appeal"). We deem these errors abandoned because
> these errors were not fully briefed.

*LaRock*, 196 W.Va. 294, 470 S.E.2d 613, 621 (1996).

Based upon the above cited authority, it is clear that issues raised on appeal that are not fully developed, or mentioned only in passing, or are mentioned but not argued, or have no legal authority cited in support can be, and probably will be, treated as waived or abandoned and not ruled upon by an appellate court. The question then becomes - does this same standard apply to lower courts - specifically to circuit courts in a post-conviction habeas corpus proceeding? There is some authority that this Court believes provides some guidance on this issue.

*State of West Virginia, Department of Health and Human Resources, Child Advocate Office v. Robert Morris N.*, 195 W.Va. 759, 466 S.E.2d 827 (1995) was a paternity action in which the Family Law Master established an amount of monthly child support and ordered payment of arrearages back to the date of the filing of the paternity action, but not back to the date of the birth of the child. An issue on appeal to the Supreme Court of Appeals of West Virginia was whether the affirmative defense of laches was plead or raised before the Family Law Master. In determining that the defense of laches was not properly plead or raised, the Court stated: "Further, '[a] skeletal 'argument', really nothing more than an assertion, does not preserve a claim. . ... Judges are not like pigs, hunting for truffles buried in briefs.'" (Citations omitted). *State DHHR v. Robert Morris N.*, 195 W.Va. 759, 466 S.E.2d 827, 833 (1995). While this same language was earlier cited when discussing an appellate court's ability to not consider issues or

8

assertions not fully developed, it is interesting to note that in *State DHHR v. Robert Morris N.*, this language was used in discussing whether the affirmative defense of laches was properly plead or raised before the Family Law Master. The above cited language therefore stands for the proposition that a litigant must do more than simply make a skeletal argument to raise and preserve an issue before a Family Law Master.

This Court accordingly FINDS that all the grounds for relief that have been listed in the various documents filed on behalf of the Petitioner and for which no evidence was presented, or have not been mentioned or argued in the <u>Petitioner's Brief in Support of Amended Petition for a Writ of Habeas Corpus ad Subjiciendum</u>, were not fully and properly raised or argued by the Petitioner and are therefore waived and will be treated as being abandoned.

## GROUND ONE:

The Petitioner, in his <u>Petitioner's Brief in Support of Amended Petition for a Writ of Habeas Corpus ad Subjiciendum</u>, argues under Point One that Counts Four, Six, and Eight of the Indictment fail to substantially follow the language of the statute, fail to state the elements of the offense charged and otherwise failed to put the Petitioner on fair notice of the charge against which he had to defend himself.

The Petitioner was charged under Counts Four, Six and Eight in the Indictment of having violated West Virginia Code 61-4-1, which is entitled Forgery of public record, certificate, return or attestation of court or officer; penalty. This statute states:

If any person forge a public record, or a certificate, return or

attestation of a clerk of a court, notary public, judge, justice, or any public officer, in relation to any matter wherein such certificate, return, or attestation may be received as legal proof, or utter or attempt to employ as true such forged record, certificate, return or attestation, knowing the same to be forged, he shall be guilty of a felony, and, upon conviction, shall be confined in the penitentiary not less than two nor more than ten years.

Counts Four, Six and Eight of the Indictment in this case each state:

That on or about the ___ day of April, 2006 in Wood County, West Virginia, KEVIN SCOTT JORDAN committed the offense of "Forgery of Public Record, Certificate Return or Attestation of Court or Officer" by unlawfully, intentionally, and feloniously forging a public record, certificate, return, or attestation of a public officer which may be received as legal proof, to wit: signing a fingerprint card with a false name, against the peace and dignity of the State.

This Court fails to understand how the Petitioner was not put on notice of the charge against which he had to defend. The Indictment specifically alleges signing a fingerprint card with a false name, the Indictment cites the correct code section under which the Petitioner was charged and the language of the Indictment tracks the language of the statute with no excessive or unnecessary language (surplusage) that might cause confusion.

Two reasons are argued in support of the Petitioner's position. First, the Petitioner argues that signing a fingerprint card with a false name does not fall within the type of documents specified in W.Va.Code 61-4-1. In other words, the Petitioner argues that a fingerprint card does not constitute a public record, certificate, return or attestation of court or officer. To support his argument, the Petitioner cites *State v. Phalen*, 192 W.Va. 267, 452 S.E.2d 70 (1994). In *Phalen*, the Supreme Court of Appeals of West Virginia upheld a conviction of forgery

10

under W.Va.Code 61-4-5 wherein the defendant signed a fingerprint card with a false name. The question before the Supreme Court of Appeals of West Virginia in *Phalen* was not whether the defendant was charged under the correct statute, but whether the proper showing of prejudice to another's right was established through the evidence. The Court held that: "a jury may find that giving a false name on a police fingerprint card constitutes forgery since the act prejudices the legal rights of the State by frustrating the State's authority to administer justice" *State v. Phalen*, 192 W.Va. 267, 270, 452 S.E.2d 70, 73 (1994).

It appears that the Supreme Court of Appeals of West Virginia has implicitly indicated that if someone signs a false name to a fingerprint card that they can be charged and convicted under W.Va. Code 61-4-5. However, no authority has been cited that forgery of a fingerprint card (signing a false name to a fingerprint card) can only be a violation of W.Va. Code 61-4-5, or that forgery of a fingerprint card (signing a false name to a fingerprint card) is not a violation of W.Va. Code 61-4-1.

In the case at bar, the State made alternative pleadings. Counts Three (Forgery) and Count Four (Forgery of Public Record, Certificate, Return or Attestation of Court or Officer) were alternative pleadings. Counts Five (Forgery) and Six (Forgery of Public Record, Certificate, Return or Attestation of Court or Officer) were alternative pleadings. Counts Seven (Forgery) and Eight (Forgery of Public Record, Certificate, Return or Attestation of Court or Officer) were also alternative pleadings. The jury found the Petitioner guilty on all counts. At sentencing, the State moved to dismiss Counts Three, Five, and Seven explaining that the Petitioner could not be sentenced under both counts at the same time since they are alternative pleadings. The Court granted the State's motion. *(See*

11

Transcript of Change of Plea and Sentencing hearing at 23)[1]. Therefore, the Court FINDS that the Petitioner was properly put on notice of the charges against him and was properly charged and convicted under W.Va.Code 61-4-1.

The Petitioner's second argument is that before he could be convicted of forgery of a public document pursuant to W.Va.Code 61-4-1, that he must have prepared the document that is alleged to have been forged. W.Va. Code 61-4-1 does not define the word "forge." However, the Supreme Court of Appeals of West Virginia has defined forgery as "the false and fraudulent making or altering of an instrument which would, if genuine, apparently impose a legal liability on another or change his legal liability to his prejudice." (emphasis added) *State v. Lotono*, 62 W.Va. 310, 58 S.E.621, 622 (1907) Further, Black's Law Dictionary, 8th Edition, defines forgery as: "1) The act of fraudulently making a false document or altering a real one to be used as if genuine; 2) A false or altered document made to look genuine by someone with the intent to deceive." Accordingly, this Court FINDS that a defendant can be convicted of forgery of a public document pursuant to W.Va.Code 61-4-1 by either preparing a false document or altering a document, and that this can occur by signing a false name to a fingerprint card.

The Court would therefore FIND and CONCLUDE that Counts Four, Six and Eight did substantially follow the language of the statute, that the Counts did state the elements of the offense charged and that the Petitioner was put on fair notice of the charge against which he had to defend. Relief for Ground One is

---

[1] There is not one comprehensive transcript in this case. Counsel have, at various times, requested certain portions of the trial and related matters to be transcribed. There are four different volumes of transcripts that will be cited to in this Opinion and Order.

Denied.

## GROUND TWO:

In Point Two of <u>Petitioner's Brief in Suppport of Amended Petition for a Writ of Habeas Corpus ad Subjiciendum</u>, the Petitioner argues that "the jury instructions failed to sufficiently instruct the jury regarding the law concerning Counts Four, Six, and Eight of the indictment" because "a forged document must be a document that was prepared by the perpetrator but alleges to be a document prepared by the public officer." This argument is similar to the argument advanced under Ground One above, and to the extent applicable, the reasons set forth for Ground One are adopted herein.

As the Supreme Court of Appeals of West Virginia has noted, "[t]he crime of forgery is not defined by statute in West Virginia." *State v. Kelly*, 183 W.Va. 509, 511, 396 S.E.2d 471, 473 (1990). The Supreme Court went on to state that "[t]he broad common law definition of forgery was stated in Syllabus Point 1 of *State v. Lotono*, 62 W.Va. 310, 58 S.E. 621 (1907): 'Forgery is the false and fraudulent making or altering of an instrument which would, if genuine, apparently impose a legal liability on another or change his legal liability to his prejudice.'"*State v. Kelly*, 183 W.Va. 509, 511-512, 396 S.E.2d 471, 473-474 (1990). Further, the Supreme Court of Appeals of West Virginia has noted that "[u]nder W.Va.Code, 61-4-1, it is a felony under certain circumstances to <u>alter</u> public records." (Emphasis Added). Footnote 6, *State v. Austin*, 160 W.Va. 337, 342, 234 S.E.2d 657, 661 (1977).

In the case before the Court, the jury was instructed with respect to Counts Four, Six and Eight that:

13

Forgery of Public Record, Certificate, Return or Attestation of Court or Officer is committed when any person unlawfully, intentionally, and feloniously forges a public record, certificate, return or attestation of a public officer which may be received as legal proof.

The burden is on the State to prove the guilt of the Defendant beyond a reasonable doubt and the Defendant, Kevin Scott Jordan is not required to prove himself innocent. He is presumed by the law to be innocent of this charge and this presumption remains with him throughout the entire trial.

Before the Defendant, Kevin Scott Jordan can be convicted of Forgery of Public Record, Certificate, Return or Attestation of Court or Officer, the State of West Virginia must overcome the presumption that the Defendant, Kevin Scott Jordan is innocent and prove to the satisfaction of the jury beyond a reasonable doubt that:

1. The Defendant, Kevin Scott Jordan,
2. in Wood County, West Virginia,
3. on or about the ___ day of April, 2006,
4. did unlawfully, feloniously, and intentionally
5. forging a public record, certificate, return, or attestation
6. of a public officer which may be received as legal proof
7. to wit: signing a fingerprint card with a false name...

(*See* Trial Record at 149-156).

The Court further instructed the jury that:

To establish that the Defendant committed a forgery, as that term is used in these instructions, means that the State of West Virginia must prove, beyond a reasonable doubt: (1) that the Defendant falsely made or altered a writing; (2) that the Defendant did so with the intent to defraud; and (3) that the writing so created or altered is of such a nature that it if were genuine it could prejudice the legal rights of another.

It is not necessary for the State of West Virginia to establish actual prejudice to the rights of another to establish forgery. It is sufficient if there is an intent to defraud and potential prejudice to the rights of another.

14

Giving a false name on a police fingerprint card prejudices the legal rights of the State by frustrating the State's authority to administer justice.

(*See* Trial Record at 155)

Based upon the above cited case law the Court FINDS that the jury was properly instructed. Relief for Ground Two is Denied.


# GROUND THREE:

Petitioner alleges ineffective assistance of trial counsel in Point Three of Petitioner's Brief in Support of Amended Petition for a Writ of Habeas Corpus ad Subjiciendum. Specifically, he argues that his trial counsel failed to fully explain the plea offered by the State and failed to maintain contact with him to discuss trial strategy.

> In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.

Syl. Pt. 1, *Becton v. Hun*, 205 W.Va. 139, 516 S.E.2d 762 (1999).


> Objective professional standards dictate that a criminal defense attorney, absent extenuating circumstances, must communicate to the defendant any and all plea bargain offers made by the prosecution. The failure of defense counsel to communicate any and all plea bargain proposals to the defendant constitutes ineffective assistance of counsel, absent extenuating circumstances.

Syl. Pt. 3, *Becton v. Hun*, 205 W.Va. 139, 516 S.E.2d 762 (1999).

15

Further, "[o]ne who charges on appeal that his trial counsel was ineffective and that such resulted in his conviction, must prove the allegation by a preponderance of the evidence." Syl. Pt. 4, *Becton v. Hun*, 205 W.Va. 139, 516 S.E.2d 762 (1999).

The Petitioner cites *Becton* to support his position that his trial counsel was ineffective. However, the present case can be distinguished from *Becton*. In *Becton*, the defendant learned of a plea offer made by the prosecution only after he reviewed his file while incarcerated. The evidence before the Supreme Court in *Becton* was that the plea offer was never communicated to the defendant in writing nor did trial counsel discuss the plea offer with the defendant. Further, at the ominibus hearing trial counsel did not have an independent recollection of the plea offer. Based on this evidence, the Supreme Court of Appeals of West Virginia found that defense counsel in *Becton* had been ineffective.

Evidentiary hearings were held in this habeas corpus proceeding on November 15, 2010, and January 19, 2011. At the November 15, 2010, evidentiary hearing, the Petitioner admitted he received a copy of the plea offer. According to his testimony an investigator sent by his attorney brought him a copy of the plea offer in writing and that when he asked for advice from the investigator, the investigator responded that he could not give him legal advise. The Petitioner further testified that his trial attorney did not discuss the plea offer with him. However, he did testify that he remembers that on the morning of December 5, 2006, (the first day of his trial) while at the Wood County Holding Center his trial attorney informed him that the plea offer was "off the table" because the jury had already been called and they were getting ready to go through

16

the selection process. He further testified that he had no contact with his trial counsel between the time he was arraigned on September 22, 2006 and the beginning of his trial on December 5, 2006. The Petitioner also admitted that the Court questioned him extensively regarding his decision to not accept the plea offer as evidenced by the following exchange between the Court and the Petitioner at Petitioner's trial:

**The Court**: Mr. Jordan, did you hear what the prosecutor and your attorney were talking about?

**The [Petitioner]**: Yes, Your Honor.

**The Court**: And do you understand - - I mean, I'm not trying to talk you into anything, I'm not trying to talk you out of anything, so I don't want you to think I am. I just want to make sure that your decision is made knowingly.

**The [Petitioner]**: Yes, Your Honor.

**The Court**: That you are accused in Count 1 of the offense of robbery in the first degree, which carries with it a potential of not less than ten years, which means that you could be given any number of years above ten. It could be eleven, it could be twenty-five, it could be thirty-five, it could be fifty. Do you understand?

**The [Petitioner]**: Yes, Your Honor.

**The Court**: And, of course, then Count 2 is conspiracy to commit robbery, which is a charge that you made an agreement with someone to commit the crime of robbery. And then in Counts 3, 4, 5, 6, 7 and 8, they're allegation of forgeries, forgery of public records, but - - and those each have a cap of either a one to ten or a two to ten year sentence, but it is possible that those sentences could run consecutive to a conviction for the robbery charge, which means it is possible that

17

you could serve your time for the robbery charge and then have to start serving additional time for the other charges. Do you understand that?

**The [Petitioner]:** Yes, sir.

**The Court:** And did you understand then that essentially what the State is agreeing - - is offering or did offer, I don't know whether it's still open, but did offer was that you could plead guilty, have a cap of no more than thirty years on a sentence, and the other charges would be dismissed and they would not pursue a recidivist for additional years because of prior convictions?

**The [Petitioner]:** Yes, Your Honor.

**The Court:** Okay. And have you fully discussed that option with your attorney?

**The [Petitioner]:** Yes, sir.

**The Court:** And you still wish to not accept the offer?

**The [Petitioner]:** Yes, sir.

(*See* Transcript of Jury Trial at 6-7)

Ms. Judith McCullough, the Petitioner's trial attorney, also testified at the November 15, 2010 evidentiary hearing. She testified that she received a copy of the written plea offer on November 30, 2006 and that she sent one of her investigators to deliver it to the Petitioner for his review. She further testified that she believes that she went to the North Central Regional Jail on November 30, 2006 to discuss the plea agreement. She testified she was uncertain if it was November 30, 2006 because the corner of the page of her notes where the date was located was missing. Ms. McCullough testified that according to her notes she discussed the plea offer with the Petitioner while at the Wood County Holding Center on the morning of December 5, 2006, before trial was scheduled to begin

18

that day. She testified that she explained that if he were convicted that the State would file a recidivist. She indicated that the Petitioner rejected the offer and he was "deliberate and very determined he would only take a ten year plea."

Now, the Petitioner's position is that his trial attorney did not explain the plea offer fully and therefore he did not understand the plea offer. The Petitioner explained that even though he informed the Court that he had fully discussed the plea offer with his trial attorney, that was not the truth.

What the Petitioner is attempting to do here is easily explained. At trial the Petitioner does not accept the plea offer and goes to trial and takes the gamble. If he is found not guilty then he is free. If he is found guilty then he attempts to get sentenced to fewer years than the sentence set out in the plea offer. If he gets sentenced to less than he would have under the plea, then the Petitioner is better off to have not taken the plea. If he gets sentenced to more than he would have received if he had taken the plea, then he files an appeal, and if not successful he files a habeas corpus petition and alleges he did not understand the plea offer.

The problem with the Petitioner's allegation that he did not understand the plea offer is severalfold. First, the plea offer was not complicated. The offer was for the Petitioner to plead guilty to Robbery in the First Degree with a cap of a 30 year sentence and all the other charges in the Indictment would be dismissed, plus the State would not file a recidivist information. The Petitioner's second problem is that he indicated that he understood the plea offer. The third problem is that now, he has an incentive to lie when he claims that he did not understand the plea offer. The fourth problem is that the Petitioner is not unsophisticated when it comes to criminal matters and court proceedings - see the Petitioner's criminal history set out more fully under Ground Seven.

19

During the Petitioner's testimony in the habeas corpus proceeding, he testified that he was of the understanding that he would automatically receive a thirty year sentence. Besides the four issues listed in the preceding paragraph that tend to negate this understanding, there is one more piece of evidence. In the same hearing wherein the Court discussed with the Petitioner the plea offer (portions of which were quoted above), the State clearly set upon the record that the thirty years was a cap. Mr. Lefebure, the assistant prosecuting attorney, stated:

> We can, Your Honor. The State had offered a plea agreement in which the defendant would plead guilty to Count 1, robbery in the first degree. There would be a binding cap or binding sentence - binding cap of years in regards to robbery in the first degree at thirty; however, that would allow for the defendant to argue for any amount of years between ten and thirty and any alternative or other charges, and the remaining charges would be dismissed against the plea - or against the defendant. And this plea agreement was rejected, Your Honor.

(*See* Transcript of Jury Trial at 4).

Therefore, both the State and the Court reviewed the plea offer of a cap of thirty years. There is no rational basis to find that the Petitioner did not understand the plea offer. In fact, the Petitioner even testified in the habeas corpus proceeding that he did not even tell his attorney that he did not understand the plea offer.

Based on the testimony at the November 15, 2010 evidentiary hearing and the Petitioner's answers to the Court regarding the plea offer, the Court FINDS that trial counsel fully discussed the plea offer with the Petitioner and that the Petitioner made a conscious decision to not accept that plea offer. Therefore, the

Court FINDS that counsel's performance was not deficient under an objective standard of reasonableness. Consequently, the Petitioner has failed to establish the first and second prong of *Strickland*.

The Petitioner also alleges trial counsel was ineffective in terms of not talking to him enough to prepare for trial. The Petitioner did testify that he obtained a copy of the discovery material, including witness statements, and that he read that material. He also admitted that he did talk with his trial counsel, but was uncertain as to how often. If we assume, without deciding, that trial counsel did not speak with him as often as Petitioner wanted (or perhaps even should have), the question still remains whether the Petitioner was prejudiced (the second prong of the *Strickland* standard). The evidence against the Petitioner was strong. As will be discussed in some of the following sections, the victim, Maywood Burdette, testified about being robbed, and also identified the Petitioner as being involved in the robbery. There was also the testimony of a Parkersburg Police Officer who found the Petitioner in the residence where the victim's wallet was located, as well as some of the victim's papers being outside that residence partially burned. There is also the testimony of the girlfriend of the co-defendant attributing a statement to the Petitioner to the effect that they had just robbed an old man. See Grounds 4 and 5 of this Opinion and Order where these facts are more fully discussed.

The Petitioner had a Hobson's Choice. If he did not testify, there was little to no evidence or argument to find him not guilty of the robbery charge. The only way he could refute the robbery charge was to testify.

Further, this case was not easy to prepare for trial. A major issue was the identification of the Petitioner by the victim. From the pre-trial reports it was

21

uncertain as to whether the victim would be able to identify the Petitioner. There was no way to be certain whether the victim would be able to identify the Petitioner until trial.[2]

Further, the Petitioner did not specify what trial strategy could have been further developed had he talked with his attorney more. The Petitioner has only asserted that trial counsel did not talk with him as much as the Petitioner would have liked. However, no evidence or argument has been made in this proceeding that at trial a defense could have been developed that was not; or that a witness could have been called that was not; or that certain cross-examination questions for certain witnesses could have been discussed and used that were not; or that a defense argument could have been used that was not; or that certain evidence or testimony could have been brought out in the Petitioner's own testimony that was not.

The Petitioner makes a statement (trial counsel did not come to the jail and talk with him enough) to support the first prong of the *Strickland* standard, but does not address the second prong of the *Strickland* standard. In regard to the second prong of the test, the reviewing court must determine whether counsel's deficient performance adversely affected the outcome in a given case. More importantly, the Petitioner must demonstrate that the complained of deficiency of trial counsel resulted in prejudice or a "reasonable probability" that in the absence of error that the result at trial would have been different. *State ex rel. Myers v.*

---

[2] It could be argued that there should have been a pre-trial hearing requested on the identification issue, but this procedure is not free from perils. Much like what happened at the preliminary hearing in this case, a pre-trial hearing on the identification issue could allow the victim (or any witness) to see the accused and feel more confident about their identification at trial.

22

*Painter*, 213 W.Va. 32, 576 S.E.2d 277 (2002). Further, in deciding ineffective assistance of counsel claims, the reviewing court need not discuss both prongs of the *Strickland* test, but may dispose of the claim if either prong is not met. *State ex rel. Edgell v. Painter*, 206 W.Va. 168, 522 S.E.2d 636 (1999). And last, when reviewing trial counsel's performance, the rule of contemporary assessment must be used which simply states that an attorney's actions must be evaluated in light of what was known and reasonable at the time of making the decision and not through the use of hindsight. *State ex rel. Daniel v. Legursky*, 195 W.Va. 314, 465 S.E.2d 416 (1995).

Based upon the evidence and argument, this Court would FIND that the Petitioner has not shown any prejudice with regard to his allegation that trial counsel was ineffective for not talking with him a sufficient number of times prior to trial..

## GROUND FOUR:

In Point Four of his Amended Petition for a Writ of Habeas Corpus ad Subjiciendum and Petitioner's Brief in Support of Amended Petition for a Writ of Habeas Corpus ad Subjiciendum, the Petitioner argues that the out-of-court identification by the victim was improperly suggestive and thus improperly tainted the in-court identification by the victim. Specifically, the Petitioner argues that the out-of-court identification was suggestive for two reasons:. 1) the victim identified the Petitioner at the preliminary hearing where the Petitioner was wearing an orange jumpsuit and 2) the victim identified the Petitioner after being shown pictures of the Petitioner and the co-defendant by the prosecutor a day before the jury trial.

23

The Court notes that "one-on-one confrontation procedures are inherently more suggestive than line-up identification procedures." *State v. Gravely,* 171 W.Va. 428, 434, 299 S.E.2d 375, 381 (1982). However, as the U.S. Supreme Court has said:

> '(T)he central question (is) whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive. As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*State v. Casdorph,* 159 W.Va. 909, 230 S.E.2d 476 (1976) (overruled on other grounds and quoting *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)).

> In determining whether an out-of-court identification of a defendant is so tainted as to require suppression of an in-court identification a court must look to the totality of the circumstances and determine whether the identification was reliable, even though the confrontation procedure was suggestive, with due regard given to such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the lenght of time between the crime and the confrontation.

*State v. Gravely,* 171 W.Va. 428, 435, 299 S.E.2d 375, 382-383 (1982)

The Supreme Court of Appeals of West Virginia has indicated that "[t]he veracity of [a witness'] in-court identification of the defendant [is] clearly a question properly submitted to the jury." *State v. Gravely,* 171 W.Va. 428, 436,

299 S.E.2d 375, 383 (1982). Also, the U.S. Supreme Court has stated: "[w]e are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *State v. Stacy*, 181 W.Va. 736, 746, 384 S.E.2d 347, 357 (1989) (quoting *State v. Boykins*, 173 W.Va. 761, 320 S.E.2d 134, 139 (1984) (quoting *Manson,* 432 U.S. at 116, 97 S.Ct. at 2254)).

In the present case, the victim, Mr. Burdette, testified at trial during cross-examination that he was never shown a photo lineup. (*See* Transcript of Jury Trial Testimony of Maywood Burdette, etc. at 21). Mr. Burdette further testified that the first time he saw and was able to identify the Petitioner was at Magistrate Court at a hearing. (*See* Transcript of Jury Trial Testimony of Maywood Burdette, etc. at 21). However, Mr. Burdette believed he would have been able to identify the Petitioner even if he had not been sitting at counsel's table in jail clothing. (*See* Transcript of Jury Trial Testimony of Maywood Burdette, etc. at 21). The victim further testified that even though he was aware that the Petitioner had been in the newspaper and television, that he did not see those news articles or news segments. (*See* Transcript of Jury Trial Testimony of Maywood Burdette, etc. at 22). He further testified that the prosecutor had shown him two photographs a day prior to trial to see if he could identify them. (*See* Transcript of Jury Trial Testimony of Maywood Burdette, etc. at 21-23, 29). The photographs were of the Petitioner and his co-defendant. (*See* Transcript of Jury Trial Testimony of Maywood Burdette, etc. at 24) Mr. Burdette testified that he could only identify the Petitioner. (*See* Transcript of Jury Trial Testimony of Maywood Burdette, etc.

25

at 24, 29). At trial Mr. Burdette made several in-court identifications of the Petitioner. (*See* Transcript of Jury Trial Testimony of Maywood Burdette, etc. at 6, 7, 9, 11 and 32).

Even though it appears, based on the above testimony, that the out-of-court identifications may have been suggestive, the question is whether under the "totality of the circumstances" the identification was reliable even though the confrontation procedure was suggestive. The Court FINDS that there was sufficient evidence for the jury to find that the identification was reliable.

First, the jury heard testimony that the victim had an opportunity to view the Petitioner at the time of the robbery. Mr. Burdette testified that he had no problems seeing the Petitioner because he was right in front of him. (*See* Transcript of Jury Trial Testimony of Maywood Burdette, etc. at 14). At trial, the Petitioner admitted that he walked up face-to-face with Mr. Burdette. (*See* Transcript of Trial Testimony of Kevin Scott Jordan at 23). Mr. Burdette further testified that the whole incident took a matter of minutes - approximately five minutes. (*See* Transcript of Jury Trial Testimony of Maywood Burdette, etc. at 27). Petitioner estimated that the whole incident took place in approximately two minutes. (*See* Transcript of Trial Testimony of Kevin Scott Jordan at 8). Mr. Burdette went on to testify that the incident took place in the evening hours around 8:50 p.m. and 9:10 p.m. (*See* Transcript of Jury Trial Testimony of Maywood Burdette, etc. at 13). However, he testified that there was a street light about 200 feet from where the incident took place and a neighbor had his porch light on. (*See* Transcript of Jury Trial Testimony of Maywood Burdette, etc. at 27).

Second, the jury heard evidence about the victim's degree of attention. Mr. Burdette testified that as Petitioner was coming toward him he kept backing up

26

while trying to keep an eye on both the Petitioner and his co-defendant who was coming up on the side and behind him. (*See* Transcript of Jury Trial Testimony of Maywood Burdette, etc. at 10 and 19). Mr. Burdette further testified that he was looking towards the Petitioner because there was mention of brass knuckles and he was looking to see if the Petitioner had any. (*See* Transcript of Jury Trial Testimony of Maywood Burdette, etc. at 25). Therefore, the Court believes that Mr. Burdette's attention towards the Petitioner was very focused out of concern for his safety.

Third, the jury was presented with evidence of Mr. Burdette's prior description of the Petitioner to the police. Mr. Burdette testified that he described the petitioner as a "sandy haired fellow." (*See* Transcript of Jury Trial Testimony of Maywood Burdette, etc. at 21). That was the only evidence before the jury regarding the Petitioner's description of Petitioner. The jury could determine if the Petitioner fit that description.

Fourth, the jury heard evidence regarding Mr. Burdette's certainty of his identification. First, Mr. Burdette testified that he recognized the Petitioner at the magistrate hearing as the one who committed the robbery against him.(*See* Transcript of Jury Trial Testimony of Maywood Burdette, etc. at 21). He then testified that he was able to identify the Petitioner the day before trial when presented with a photograph by the prosecutor. (*See* Transcript of Jury Trial Testimony of Maywood Burdette, etc. at 24, 29). The Court notes that Mr. Burdette was not able to identify the other assailant. Mr. Burdette testified throughout his testimony that the Petitioner was involved in the robbery against him. (*See* Transcript of Jury Trial Testimony of Maywood Burdette, etc. at 6, 7, 9, 11 and 32)

27

Lastly, the jury heard evidence of the length of time between the crime and the identification. Mr. Burdette testified that the incident in question took place around April 22, 2006. (*See* Transcript of Jury Trial Testimony of Maywood Burdette, etc. at 13). He further testified that he made the first identification at a hearing in Magistrate Court. (*See* Transcript of Jury Trial Testimony of Maywood Burdette, etc. at 21). A review of the Trial Transcript does not disclose the date of the hearing. However, the Trial Record in this case reflects that the preliminary hearing in Magistrate Court was held on May 2, 2006 (*See* Trial Record at 33). Mr. Burdette further testified that he identified a photograph of the Petitioner a day before trial. (*See* Transcript of Jury Trial Testimony of Maywood Burdette, etc. at 24, 29)

The Court FINDS that based on the totality of the circumstances surrounding Mr. Burdette's identification, that a substantial likelihood of misidentification is not present. This is based upon not only his independent observations of the Petitioner, and the conditions under which those observations took place, but also because he was subject to cross-examination which failed to weaken his certainty in identifying the right person in court.

However, the identification of the Petitioner by the victim as being involved in this crime is not the only evidence that tends to establish the Petitioner's involvement. This offense was reported to the Parkersburg Police almost immediately after it occurred. As a result, Officer Brown with the Parkersburg Police Department started a neighborhood canvas. During this canvas, upon approaching 802 1/2 Camden Avenue, Officer Brown noticed the front door standing open. While talking with the co-defendant at this residence, Officer Brown noticed some burned debris lying on a picnic table in front of the residence.

There were also some papers on the picnic table that were not completely burned that had Mr. Burdette's name on them. The Petitioner was also inside the residence at 802 1/2 Camden Avenue. (*See* Transcript of Jury Trial Testimony of Maywood Burdette, etc. at 100-108).

After securing a consent to search, the victim's wallet, which contained various forms of identification, was found behind an entertainment center in the living room of the residence at 802 1/2 Camden Avenue. Also, a pair of brass knuckles was found in a trash can in the living room of 802 1/2 Camden Avenue. (*See* Transcript of Jury Trial Testimony of Maywood Burdette, etc. at 100-108).

Further, the residence where the Petitioner and his co-defendant were located was the apartment of the co-defendant's girlfriend, Cody Hutchinson. Cody Hutchinson testified at trial that the Petitioner told her that "they had seen an old man walking, and that he went up behind him and grabbed him by the throat and took him to the ground and kicked him and took his wallet. . ." (*See* Transcript of Jury Trial Testimony of Maywood Burdette, etc at 36).

In addition to the above, the Petitioner, during his case, testified that he was present at the scene. He, of course, denied involvement in the commission of the crime, but he nevertheless put himself at the scene.

This Court, therefore, FINDS and CONCLUDES that considering the totality of the circumstances that the out of court identification of the Petitioner was not improper and that the identification of the Petitioner was appropriate.

**GROUND FIVE:**

Petitioner argues that he was entitled to an instruction on the lesser included offense of second degree robbery in Point Five of Petitioner's Brief in Support of

Amended Petition for a Writ of Habeas Corpus ad Subjiciendum. The question as to whether the Petitioner was entitled to a lesser included instruction in this case is a two step process. The first inquiry is a legal issue, as to whether the lesser offense is, by virtue of its legal elements or definition, included in the greater offense. The second inquiry is a factual one, and involves a determination by the trial court as to whether there is evidence which would tend to prove such lesser included offense. *State v. Neider*, 170 W.Va. 662, 295 S.E.2d 902 (1982). "Where there is no evidentiary dispute or insufficiency on the elements of the greater offense which are different from the elements of the lesser included offense, then the defendant is not entitled to a lesser included offense instruction." Syllabus Point 2, *State v. Neider*, 170 W.Va. 662, 295 S.E.2d 902 (1982).

Assuming, without deciding, that robbery in the second degree is a lesser included offense of robbery in the first degree, (*See, State v. Johnson*, 219 W.Va. 697, 639 S.E.2d 789 (2006)), the critical inquiry in this case is whether there are any facts to support a robbery in the second degree instruction. In the trial of this case facts concerning the robbery came from three sources: the victim, Maywood Burdette; the co-defendant's girlfriend, Codi Hutchinson; and the Petitioner himself.

Mr. Burdette testified as follows regarding the incident:

"So I was backing up at the same watching one on this side come up. He kept hollering - - [Petitioner] kept hollering at Wines to get behind me, and I'm backing up. I'm not too far from the house I'd say, because I was trying to get up in the yard. But eventually he got --"

\*\*\*

"Well, eventually Wines got me around the neck, arm lock on the throat, and so I just went down on one knee. And he hollered - -

30

[Petitioner] hollering, 'Yeah, we want your money.', and he - - I was short of breath because I'd walked that, and it was hurting my Adam's apple. It was shutting my breath off, so I - - well, I just went down on that knee, and Wines put his knee on my back. And I put the cane between my legs. I 'retch up here to loosen his arms so I could breathe. He said, 'Give me your money.', [Petitioner] did. He said, 'Yeah, I want your money.' So I said, 'Well , raise up so I can get my wallet.' So he raised up and I 'retched my hand and got my wallet, gave it to him, and they left, went down the road.'

(See Transcript of Jury Trial Testimony of Maywood Burdette, etc. at 10-11).

Codi Hutchinson, the girlfriend of the co-defendant in this case, testified that on the night in question the Petitioner "stated that they had seen an old man walking, and that he went up behind him and grabbed him by the throat and took him to the ground and kicked him and took his wallet, and that he had a stick and that he hit him with it." (See Transcript of Jury Trial Testimony of Maywood Burdette, etc. at 36).

The Petitioner denied that he had told Ms. Hutchinson that he had strangled or chocked Mr. Burdette. (See Transcript of Trial Testimony of Kevin Scott Jordan at 13). However, the Petitioner testified as to his version of the events as follows:

"Mr. Wine, he turned to me and said, 'Watch this.', and he proceeded down Hall Street in the middle of the street. And I was walking on the right-hand side of the street at this time and he was walking behind the gentleman, Mr. Burdette. At this time I had no clue what was going to happen yet. And he said, 'Drop your stick.'

\*\*\*

I started walking over towards the middle of the street where they were from the right-hand side of the road

31

***

Well, I didn't - - I really didn't know what was going on at first and I was in shock at first, and I wanted to walk over there and see what was, you know, really going on.

***

At that point - - at that point, Eric was asking Mr.Burdette for his money and he had him in a choke hold, and I started walking over there. And I asked - - I yelled at Mr. Wine, I said, 'What are you doing?', and he kept asking Mr. Burdette for his money. And at that time I seen that Mr. Burdette was having problems to breathe, you know, it was like his air was constricted, and I told Mr. Burdette, I said, 'I think he's serious.' I said, 'Give him is his money or just give him the money, leave it alone.', and he, Mr. Burdette, didn't comply. At that point I didn't know what to do.

(See Trial Testimony of Kevin Scott Jordan at 5-7).

Clearly, the testimony of the victim, Mr. Burdette, supports a jury instruction for robbery in the first degree, and would not support a jury instruction for robbery in the second degree. Codi Hutchinson's testimony is the same - to the extent it supports any robbery offense, it is robbery in the first degree.

The factual issue raised by the Petitioner's testimony is not whether the offense was robbery in the first degree or robbery in the second degree. To the extent that the Petitioner's testimony raises a factual issue, it is whether the Petitioner was involved, to any extent, with the robbery. The robbery that the Petitioner describes in his testimony is first degree robbery - ". . . asking Mr. Burdette for his money and he had him in a choke hold . . ." . . . ". . . Mr. Burdette

32

was having problems to breathe, you know, it was like his air was constricted . . .".

The Court would FIND that there was no evidence to support the giving of a lesser included offense instruction given the facts as presented to the jury.

On Page 12 of his Brief, Petitioner argues that "[s]ince evidence was presented that the individual Mr. Burdette identified as [Petitioner] did not strangle, suffocate, strike, or beat him or present a firearm or other deadly weapon, [Petitioner] was entitled to an instruction regarding the lesser included offense of robbery in the second degree." While Petitioner is correct that the victim in this case testified to the above, he fails to note that the State chose to prosecute under the concerted action principle.

"Under the concerted action principle, a defendant who is present at the scene of a crime and, by acting with another, contributes to the criminal act, is criminally liable for such offense as if he were the sole perpetrator." Syl. Pt. 7, *State v. Foster*, 221 W.Va. 629, 656 S.E.2d 74 (2004). The jury was instructed "that it is not necessary for a Defendant to do any particular act constituting at least part of the crime in order to be convicted of the crime so long as the Defendant is present at the scene of the crime and the evidence is sufficient to show that the Defendant is acting together with another who does the acts necessary to constitute the crime pursuant to a common plan or purpose to commit the crime." (*See* Trial Record at 143).

It is important to note that "[c]redibility determinations are for a jury and not an appellate court." *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995). Based upon the verdict, it appears that the jury found Mr. Burdette's testimony more credible.

The Court FINDS there was not sufficient evidence to give an instruction on

33

second degree robbery because under the concerted action principle there was sufficient evidence for the jury to find that even though the Petitioner was not the one who chocked or strangled the victim, he was present at the scene of the crime and not simply an innocent bystander because according to the victim the Petitioner attempted to punch him twice and ordered him to give them his money.

## GROUND SIX:

In Point Six of his Brief, Petitioner argues that he was denied a panel of unbiased jurors when the trial court failed to disqualify jurors when it was demonstrated during voir dire that several potential jurors had a relationship to a prosecutorial arm of the State.

Specifically, Petitioner first argues that Juror Civitillo should have been disqualified for cause because his son-in-law was an assistant prosecutor in Raleigh County.

> Employment of a prospective juror in a law enforcement or prosecutorial agency operates as a per se disqualification for cause if properly raised by counsel. However, . . . a prospective juror's consanguineal, marital or social relationship with an employee of a law enforcement agency does not operate as a per se disqualification for cause in a criminal case unless the law enforcement official is actively involved in the prosecution of the case. After establishing that such a relationship exists, a party has a right to obtain individual voir dire of the challenged juror to determine possible prejudice or bias arising from the relationship. Where . . . the party does not seek additional voir dire to demonstrate possible bias or prejudice, there is no error in the court's refusal to strike such prospective juror for cause.

*State v. Beckett*, 172 W.Va. 817, 823, 310 S.E.2d 883, 889 (1983).

Petitioner cites *State v. West*, 157 W.Va. 209, 200 S.E.2d 859 (1973) to

34

support the disqualification. In *West*, the Supreme Court of Appeals of West Virginia held that "But when the defendant can demonstrate even a tenuous relationship between a prospective juror and any prosecutorial or enforcement agency of the State government, defendant's challenges for cause should be sustained by the court." *Id.* at 219, 866. However, in *Beckett*, the Court went on to clarify that "the 'tenuous relationship' language contained in the text of *West* cannot be taken to mean that any juror who is either related by kinship or marriage to or is acquainted socially with an employee of a law enforcement agency is automatically disqualified for cause. We believe that upon the disclosure of such a relationship the defendant must be permitted individual voir dire to determine whether the juror has any possible bias or prejudice arising out of such relationship." *State v. Beckett*, 172 W.Va. 817, 822, 310 S.E.2d 883, 888-889 (1983).

Juror Civitillo, in response to the Court's questioning during voir dire, indicated that his son-in-law was an assistant prosecutor in Raleigh County. (*See* Transcript of Jury Trial at 25 and 48). The Court went on to ask juror Civitillo along with other jurors, "The relationship that you've just told us about, is that going to cause any of you to favor one side or the other in this case? If it's going to cause you to favor one side or the other let us know, raise your hand." Juror Civitillo did not raise his hand. (*See* Transcript of Jury Trial at 27). The Court further asked: "Do each of you then believe that you can be a fair and impartial juror in this case? If you think you can, please raise your hand. Please keep it raised high enough and long enough until we see who has or has not raised their hand." (*See* Transcript of Jury Trial at 38). The record reflects that all jurors raised their hands, including juror Civitillo. (*See* Transcript of Jury Trial at 38).

35

As stated above, simply being related to an employee of a law enforcement agency does not automatically disqualify a juror. Here, defense counsel did not seek to question juror Civitillo further on this relationship nor did she make a challenge for cause. (*See* Transcript of Jury Trial at 58-65). Therefore, Petitioner's argument that juror Civitillo should have been disqualified is without merit.

The Petitioner next argues that juror Johnson should have been disqualified because he was good friends with law enforcement officers in Vienna, West Virginia; his wife employed the Chief's daughter part-time; and his wife's stepbrother was a State Highway Patrolman and retired U.S. Marshall. Juror Johnson testified that he was very good friends with an officer in Vienna, that the Chief of Police's daughter worked for his wife part time while she was out of school; and that his wife's stepbrother was a State Highway Patrolman and he retired as a U.S. Marshall. (*See* Transcript of Jury Trial at 26). Juror Johnson was also asked by the Court if these relationships would cause him to favor one side or the other and he responded in the negative. (*See* Transcript of Jury Trial at 27). Juror Johnson also raised his hand to indicate he could be fair and impartial. Like in juror Civitillo's case, defense counsel did not inquire any further into these relationships. *(See* Transcript of Jury Trial at 58-65). Again, the mere fact that jurors might know an employee of law enforcement does not in and of itself disqualify them. There must be some evidence of bias or prejudice as a result of that relationship and there was no such evidence with regard to juror Johnson.

The Petitioner also argues that juror Angelos should have been disqualified because her daughter used to work for the Wood County Prosecutor's Office and her daughter was a student in a course taught by the presiding judge. With regard to juror Angelos's daughter working for the Wood County Prosecutor's Office,

"[g]enerally speaking, a potential juror closely related by blood or marriage to either the prosecuting or defense attorneys involved in the case or to any member of their respective staff or firms should automatically be disqualified." *State v. Beckett*, 172 W.Va. 817, 822, 310 S.E.2d 883, 888 (1983). In the instant case juror Angelos testified that her daughter worked for Mrs. Conley last year. (*See* Transcript of Jury Trial at 26). She further testified during the State's voir dire that her daughter used to work as a victim's advocate. (*See* Transcript of Jury Trial at 48). During defense counsel's questioning, juror Angelos clarified that her daughter worked as an assistant victim's advocate during the time when Ms. Conley was the prosecuting attorney and that she had left that employment approximately a year ago. (*See* Transcript of Jury Trial at 59-60). Again, when the Court asked the jurors whether they believed they could be fair and impartial, juror Angelos responded affirmatively by raising her hand. (*See* Transcript of Jury Trial at 38).

During the State's questioning, juror Angelos also disclosed that the presiding judge had taught her daughter in college. (*See* Transcript of Jury Trial at 48-49). "The true test as to whether a juror is qualified to serve on the panel is whether without bias or prejudice he can render a verdict solely on the evidence under the instruction of the court." Syl. Pt. 1, *State v. Wilson*, 157 W.Va. 1036, 207 S.E.2d 174 (1974). Here, the record reflects that defense counsel did not question juror Angelos further into this relationship, nor challenge juror Angelos. (*See* Transcript of Jury Trial at 58-65) The Supreme Court has noted that "[w]here, as in the present case, the party does not seek additional voir dire to demonstrate possible bias or prejudice, there is no error in the court's refusal to strike such prospective jurors for cause." *State v. Beckett*, 172 W.Va. 817, 823,

310 S.E.2d 883, 889 (1983). Therefore, Petitioner's argument is without merit.

The Petitioner further argues that juror Rhodes should have been disqualified because he was friends with a lot of military police officers. During voir dire, juror Rhodes disclosed that while he was in the military he was friends with a lot of MPs (military police) and did maintenance on their vehicles. (*See* Transcript of Jury Trial at 27). The Court inquired further of juror Rhodes regarding this relationship by the following: "The relationship that you've just told us about, is that going to cause...you to favor one side or the other in this case? If it's going to cause you to favor one side or the other let us know, raise your hand." (*See* Transcript of Jury Trial at 27) The record reflects that juror Rhodes did not raise his hand. (*See* Transcript of Jury Trial at 27). The record further reflects that defense counsel did not question him further on these relationships nor challenge juror Rhodes for cause. (*See* Transcript of Jury Trial at 58-65). Therefore, based upon *Beckett,* the Court FINDS this argument without merit.

Finally, the Petitioner argues that juror Defibaugh should have been disqualified because her husband was in the military police in the 1960's. During voir dire, juror Defibaugh disclosed that her husband was an MP in the military in the 1960's. (*See* Transcript of Jury Trial at 27). Like juror Rhodes, the Court inquired further into this relationship. Juror Defibaugh indicated that this relationship would not cause her to favor one side or the other. (*See* Transcript of Jury Trial at 27). Defense counsel did not question juror Defibaugh further on this relationship. Therefore, based on *Beckett,* the Court FINDS that this challenge is without merit.

Based upon the above analysis, this Court FINDS and CONCLUDES that the Petitioner was not denied a panel of unbiased jurors and that there was not

38

sufficient evidence to support the disqualification of any of the challenged jurors.

## GROUND SEVEN:

In Point Seven of his Brief, Petitioner argues that "the disparate sentence of the defendant whose involvement was minor compared to the similarly situated codefendant is unconstitutional and should be reversed."

As indicated above, the Petitioner was charged, in an 8 Count Indictment, with robbery in the first degree; conspiracy to commit robbery in the first degree; three counts of forgery; and, three counts of forgery of a public record, certificate, return or attestation of a court or officer. The Petitioner elected to proceed to trial and was convicted on all 8 counts. The forgery counts were subsequently dismissed and the Petitioner received a fifty-five (55) year sentence on the robbery in the first degree conviction; a sentence of not less than one (1) nor more than five (5) year sentence on the conspiracy conviction and a sentence of not less than two (2) nor more than ten (10) year sentence on each of the three forgery of a public record, certificate, return or attestation of a court or officer convictions.

The Petitioner's codefendant, Eric Wine, was also charged with robbery in the first degree and conspiracy to commit robbery in the first degree. He was not charged with any of the forgery charges. Mr. Wine also elected to go to trial and he was also convicted on each of the charges. Mr. Wine received a twenty (20) year sentence for his conviction for robbery in the first degree and a sentence of not less than one (1) nor more than five (5) year sentence on the conspiracy conviction. These sentences were to be served concurrently.

Disparate sentences for codefendants are not per se unconsitutional. Courts consider many factors such as each defendant's respective involvement in the criminal transaction (including who was the prime mover), prior records, rehabilitative potential (including post-arrest conduct, age and maturity), and lack of remorse. If codefendants are similarly situated, some courts will reverse on disparity of sentence alone.

Syl. Pt. 2, *State v. Buck*, 173 W.Va. 243, 314 S.E.2d 406 (1984). Further, the Supreme Court of Appeals of West Virginia has noted that "where the co-defendants differ in their criminal backgrounds or in their role or participation in the offense, disparate sentences are justified." *Smoot v. McKenzie*, 166 W.Va. 790, 792, 277 S.E.2d 624, 625 (1981)

The Court FINDS that the Petitioner and his co-defendant, Eric Wines, were not similarly situated. The Petitioner argues "that the evidence at trial was clear that the person Mr. Burdette identified as Mr. Wine was the prime mover during the criminal transaction when he grabbed Mr. Burdette from behind suffocating him and dragging him to the ground." (*See* Petitioner's Brief at 14). The Court does not agree with the Petitioner's assertion that Mr. Burdette identified Mr. Wine as the prime mover. During his testimony, Mr. Burdette testified as follows;

"So I was backing up at the same time watching one on this side come up. He kept hollering - - Jordan kept hollering at Wines to get behind me, and I'm backing up."

\*\*\*

Well, eventually Wines got me around the neck, arm lock on the throat, and so I just went down on one knee. And he hollered - - Jordan hollering, 'Yeah, we want your money. We want your money.

40

We want your money."

(*See* Transcript of Jury Trial Testimony of Maywood Burdette, etc. at 10).

Mr. Burdette further testified that the Petitioner "done all the talking" and "punched at [him] two times" (*See* Transcript of Jury Trial Testimony of Maywood Burdette, etc. at 13). It is this Court's FINDING that the Petitioner's role was, at least, equal to that of his co-defendant (Wine) and that while the Petitioner may not have had any physical contact with the victim, the Petitioner still placed the victim in apprehension of harm, he seemed to be directing the co-defendant in the commission of the crime, and he did nothing to prevent the co-defendant from injuring the victim.

The Court notes that the Petitioner does not discuss the difference in criminal histories between the Petitioner and his co-defendant. This fact is very important in the determination that the Petitioner and his co-defendant are not similarly situated. At the sentencing hearing held on April 20, 2007, the Court made the following findings:

> In terms of the specific number of years for the robbery offense, the Court would state as factors that the Court took into consideration: the fact that this was a crime of violence to an elderly person with the use of or threatened use of a weapon. Further aggravating factors are the defendant's lack of taking responsibility for this offense; his prior criminal record in two different states; attempt to deceive law enforcement when arrested.
>
> There is, as [the Court] can find, one mitigating factor, and that would be his age, but that mitigating factor is far outweighed by the aggravating factors.

41

(*See* Transcript of Change of Plea and Sentencing at 26).

The Presentence Investigation Report for the Petitioner indicates that he is "a multi-state offender with an active warrant for probation violation out of Frederick County, Virginia and another warrant for probation violation out of Baldwin County, Alabama." The Report also indicates that the Petitioner disclosed a juvenile history in Maryland. As an adult, it indicates that the Petitioner was found guilty for the following charges in Virginia: in 2002 grand larceny and breaking and entering with intent to commit felony; in 2002 failure to appear on a felony charge (a felony); and, in 2004 possession of a controlled substance (2 counts). The Report also indicates that he was convicted of the felony offense of forgery and the misdemeanor offense of theft of property in Alabama in 2003. The Report further indicates that in Alabama the Petitioner absconded from probation supervision after 5 months. The Petitioner's Presentence Investigation Report also indicates that the Petitioner fled to Alabama, where an uncle lived, after being arrested for a drug offense in Virginia.

Like the Petitioner, his co-defendant (Wine) has a juvenile history. As an adult, Wine was convicted in Wood County, West Virginia for the following misdemeanor offenses: domestic assault and domestic battery. It also indicates that the following charges were dismissed pursuant to plea agreements: brandishing a deadly weapon, petit larceny, and destruction of property. This appears to be the extent of Wine's criminal history.

Based on this information, the Court FINDS and CONCLUDES that the Petitioner's criminal history is much more extensive than the co-defendant's. The Court further FINDS and CONCLUDES that the Petitioner and the co-defendant

42

are not similarly situated and that there is justification for the differences in the sentences imposed.

Based upon a thorough review of all the grounds properly presented for relief, this Court FINDS and CONCLUDES that the Petitioner is not entitled to any relief in this habeas corpus proceeding. Accordingly, it is ORDERED that relief in habeas corpus is Denied and this case is Dismissed.

The Clerk of this Court is to provide a copy of this Opinion and Order to counsel of record.

6-6-2012

ENTER:

JEFFREY B. REED, JUDGE

43